# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JAMIE E. STRASSER,

           Plaintiff,

v.                                                   Case No. 22-CV-1398

CHARLES LARSON, *et al.*,

           Defendants.

## DECISION AND ORDER

      Plaintiff Jamie E. Strasser, who is representing himself and currently confined at Oshkosh Correctional Institution, brings this lawsuit under 42 U.S.C. § 1983. Strasser was allowed to proceed on a claim against defendant Dr. Charles Larson under the Eighth Amendment alleging that Dr. Larson was deliberately indifferent to Strasser's chronic pain. Strasser was also allowed to proceed on a claim against defendants Hannah Utter and Dr. Daniel LaVoie under the Eighth Amendment for alleged deliberate indifference to Strasser's medical needs when they prescribed him a less expensive blood thinner than the one he wanted. Strasser further was allowed to proceed against defendants Utter, LaVoie, and Laurie Jean Wachholz under the Eighth Amendment for allegedly denying him pain medication while he was incarcerated at Green Bay Correctional Institution (GBCI).

      The defendants filed a motion for summary judgment. (ECF No. 50.) A large part of their argument was that the claims against Dr. LaVoie, Wachholz, and Utter

were barred by claim preclusion because they were addressed in *Strasser v. Tondkar et al.,* Case No. 21-CV-1257-WCG (*Strasser 1*). (ECF No. 51 at 9-14.) On December 5, 2024, the court issued an order finding that *Strasser 1* barred claims against Dr. LaVoie, Wachholz, and Utter for events that occurred from June 2021 through October 29, 2021. (ECF No. 67 at 5.) However, the court also determined that claims against Dr. LaVoie, Wachholz, and Utter for events that occurred from October 30, 2021, through November 23, 2022, were not barred. (*Id.* at 5-6.) Because the defendants did not include any Proposed Findings of Fact or evidence addressing events occurring during this time period, pursuant to Fed. R. Civ. P. 56(f)(2) the court withheld ruling on the motion for summary judgment and gave the parties an opportunity to supplement their materials to address Strasser's claims against Dr. LaVoie, Wachholz, and Utter relating to events that occurred from October 30, 2021, through November 23, 2022. (*Id.* at 6.)[1]

Both parties have supplemented their materials and the motion is ready for a decision. The parties have consented to the jurisdiction of a magistrate judge. (ECF Nos. 3, 21.)

## PRELIMINARY MATTER

The defendants argue that Strasser failed to follow Federal Rule of Civil Procedure 56 when responding to their motion for summary judgment because he did

---

[1] Because the defendants never argued that the claim against Dr. Larson was barred by the doctrine of claim preclusion, the court will consider the arguments and evidence from both parties that were presented in the original briefing (ECF Nos. 51-55, 61-65), as well as the supplemental briefing to determine whether Dr. Larson is entitled to summary judgment.

2

not properly support his response with evidence. (ECF No. 89 at 1-3.) District courts are entitled to construe *pro se* submissions leniently and may overlook a plaintiff's noncompliance by construing the limited evidence in the light most favorable to the plaintiff. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016). Strasser responded to the defendants' proposed findings of facts, explaining his position. Strasser also invokes 28 U.S.C. § 1746 in his complaint, which is enough to convert the complaint into an affidavit for purposes of summary judgment. *See Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017); *Owens v. Hinsley*, 635 F.3d 950, 954–55 (7th Cir. 2011). As such, the court will consider the information contained in Strasser's submissions where appropriate in deciding defendants' motion.

**FACTS**

*Dr. Larson's Treatment of Strasser*

On December 7, 2019, while incarcerated at Fox Lake Correctional institution, Strasser was admitted to Waupun Memorial Hospital because of pain in his right leg. (ECF No. 52, ¶ 7.) The hospital doctors "diagnosed him with right-side deep vein thrombosis (DVT)" (*Id.*, ¶ 7.) Strasser was discharged from the hospital two days later, and the discharge instructions included a prescription for Eliquis, an anticoagulant/blood thinner. (*Id.*, ¶¶ 8-9.)

On December 10, 2019, Dr. Larson, who was responsible for supervising the treatment protocols for prisoners at Fox Lake, was notified that Strasser was requesting Norco (an opioid) for pain, and that non-defendant Dr. Carol Radovich refused to order it. (ECF No. 52, ¶¶ 5, 10, 11.) Instead, Dr. Radovich ordered that

3

Strasser was to be given ibuprofen for pain management. (*Id.*, ¶ 16.) Strasser believed that ibuprofen has a contraindication with Eliquis. (*Id.*, ¶ 14.) The defendants state that, while it is true that Eliquis has a contraindication with ibuprofen, it is a relative rather than absolute contraindication, which means that, although "a prescriber should be cautious when ordering the two medications together," using both at the same time, depending on the patient's specific condition, may be appropriate for pain relief. (*Id.*, ¶¶ 14-15.) Using his professional judgment and considering Strasser's condition at the time, Dr. Larson determined that ibuprofen "was an appropriate option" for pain relief. (*Id.*, ¶ 16.)

Strasser states that Dr. Larson "was on notice by Strasser of the negative affects [*sic*] Strasser was exhibiting and [Dr. Larson] continued to ignore this." (ECF No. 61 at 4.) However, Strasser does not describe what negative effects he was experiencing and how Dr. Larson was put on notice of those effects.

Strasser was transferred from Fox Lake to the Wisconsin Resource Center on December 16, 2019, after which Dr. Larson had no more interactions with him. (ECF No. 52, ¶ 18.)

*Strasser's Interactions with Dr. LaVoie, Wachholz, and Utter*

Strasser was transferred from the Wisconsin Resource Center to GBCI on June 24, 2021. (ECF No. 79, ¶ 31.) At the time, he was on Lyrica to treat his chronic pain issues, including his leg pain and back pain. (*Id.*, ¶¶ 27-29.) The defendants note that when a prisoner "transfers from a non-DOC facility to a DOC facility they continue taking their previously prescribed medication for 30 days." (*Id.*, ¶ 32.) During that

4

time the Advanced Care Provider at the new institution reviews the prisoner's medications and seeks approval for any non-formulary medications (medications that are not preapproved by the Department of Corrections and not listed on the "formulary" list of prescriptions). (*Id.*, ¶¶ 7-9, 32.) The defendants do not clearly explain the relevance of this procedure, given that the Wisconsin Resource Center, according to its website, is managed by the Department of Health Services in partnership with the Department of Corrections. https://www.dhs.wisconsin.gov/wrc/index.htm.

It is also unclear from the defendants' Supplemental Proposed Findings of Fact if this is what occurred here, probably because these events fall outside the scope of this case. However, to provide context, looking back at *Strasser 1*, on July 8, 2021, non-defendant Dr. Farzaneh Tondkar, who was Strasser's Advanced Care Provider at GBCI at the time, submitted a request to Dr. LaVoie asking him to approve Strasser's Lyrica prescription even though it was non-formulary. (Case No. 21-cv-1257, ¶ 53.) Dr. LaVoie denied this request because Dr. Tondkar "did not provide clinical justification for the request." (*Id.*, ¶ 54.) Requests are automatically denied if information is missing. (*Id.*, ¶ 55.) Dr. Tondkar did not resubmit the request. (*Id.*, ¶ 56.) Thus, upon admission into GBCI, Strasser's Lyrica prescription was cancelled.

Wachholz's Treatment of Strasser

Wachholz became Strasser's Advanced Care Provider in August 2021. (ECF No. 79, ¶ 84.) On September 5, 2021, Strasser was sent to a hospital Emergency Department (the defendants' Proposed Findings of Fact do not say which hospital) for

5

Case 1:22-cv-01398-WED    Filed 05/27/25    Page 5 of 20    Document 90

severe leg pain. (*Id.*, ¶ 85.) As a result, Wachholz submitted a request for Strasser to be placed on a low bunk/low tier restriction. (*Id.*) Wachholz saw Strasser on September 13, 2021, for a follow-up visit wherein they discussed Strasser's plan of care. (*Id.*, ¶ 86.) This included starting Strasser on Warfarin (a blood thinner to treat Strasser's DVT) and 1000 mg of Tylenol for pain. (*Id.*) A follow-up appointment was scheduled for two weeks later. (*Id.*)

On September 21, 2021, the GBCI Health Services Unit (HSU) received a Health Services Request (HSR) from Strasser in which he complained that he was not given anything for his pain "again". (ECF No. 79, ¶ 87.) In response, Wachholz saw Strasser a week later, wherein she approved use of a wheelchair and submitted a request for approval for biofreeze (which was approved). (*Id.*, ¶ 90.) The defendants' Proposed Findings of Fact do not say what biofreeze is or what its purpose is, although context suggests it is for pain relief. On September 30, 2021, Wachholz reviewed "a functional observation completed on Strasser, which noted that no functional abnormalities were observed in his self-abilities or physical activity of walking." (*Id.*, ¶ 91.)

Wachholz next examined Strasser on November 23, 2021. (ECF No. 79, ¶ 92.) They discussed his falls, including the possibility of starting physical therapy. (*Id.*) Wachholz also increased the amount of biofreeze Strasser was allowed. (*Id.*) On November 29, 2021, Wachholz reviewed another functional observation of Strasser, which indicated that he "showed no obvious signs of pain, and there was no consistent use of equipment such as a walker or cane." (*Id.*, ¶ 93.)

6

Case 1:22-cv-01398-WED    Filed 05/27/25    Page 6 of 20    Document 90

On January 21, 2022, Strasser was taken to the Emergency Department (again, the defendants do not specify at which hospital), "where he was diagnosed with a new right femoral vein" blood clot/DVT. (ECF No. 79, ¶ 94.) Three days later, after a follow-up visit with Strasser, Wachholz submitted a request for 5 mg of Eliquis (to prevent blood clots), which was approved. (*Id.*, ¶ 95.)

On February 17, 2022, Wachholz had another follow-up with Strasser regarding his DVT and ordered a consult for hematology. (ECF No. 79, ¶ 97.) Wachholz also noted that Strasser's international normalized ratio on Warfarin (an assessment by blood test that "considers the risk of bleeding or coagulation status of a patient") was "in a therapeutic range for Warfarin, meaning his dose of Warfarin was correct for the effective management of his condition." (*Id.*, ¶¶ 97-98.) (It is unclear from the defendants' Proposed Findings of Fact if Strasser was taking Eliquis or Warfarin at the time of the February 17, 2022, appointment.) Strasser and Wachholz also discussed other ways Strasser could mitigate his symptoms, such as exercise, good hydration, and weight loss. (*Id.*, ¶ 99.)

On March 4, 2022, Strasser was seen in the HSU by non-defendant Dr. Palop, who was the on-call medical provider. (ECF No. 79, ¶ 100.) Dr. Palop sent Strasser to the Emergency Department (again, the defendants do not state at which hospital). (*Id.*) The healthcare providers in the Emergency Department "found that Strasser had more extensive clots than he would have six weeks prior." (*Id.*, ¶ 101.) While at the Emergency Department Strasser was asked if he would consider going back on

7

Warfarin, but he refused. (*Id.*) As a result, the medical providers at the Emergency Department "recommended a trial of Pradaxa 150 mg." (*Id.*)

Non-defendant Dr. Roth, a medical provider in the Emergency Department at St. Vincent Hospital, spoke with Wachholz on March 7, 2022. (ECF No. 79, ¶ 102.) He told Wachholz that "Strasser was requesting narcotics for pain the whole time." (*Id.*) The next day, based on the Emergency Department's recommendation, Wachholz discontinued Strasser's prescription for Eliquis and ordered Pradaxa. (*Id.*, ¶ 103.)

On March 14, 2022, Wachholz saw Strasser for a follow-up appointment to review his pain management plan. (ECF No. 79, ¶ 104.) Strasser requested gabapentin and pregabalin, both of which are considered dangerous for the prisoner population because of their propensity for abuse. (*Id.*, ¶¶ 16, 104.) Wachholz explained that, when she conferred with Dr. LaVoie on or about March 10, 2022, it was determined gabapentin or pregabalin were not appropriate for Strasser due to his history of opioid abuse. (*Id.*, ¶¶ 104, 123.) Instead, she offered Celebrex as an alternative pain medication, but Strasser refused. (*Id.* ¶¶, 104-105.)

Several months later, on July 8, 2022, Strasser met with non-defendant Dr. Malo in GBCI's pain services department. (ECF No. 79, ¶ 106.) Strasser was offered "epidural steroid injections to help with his back pain", but Strasser declined, stating he would prefer to see non-defendant Dr. Choi at Waupun Memorial Hospital. (*Id.*) However, GBCI HSU staff determined there was no reason at that time to send Strasser to see Dr. Choi. (*Id.*, ¶ 107.)

8

On August 22, 2022, Wachholz "noted that Strasser was at risk for post-thrombotic syndrome." (ECF No. 79, ¶ 108.) It is not clear from the defendants' Supplemental Proposed Findings of Fact how Wachholz determined this (whether through an in-person examination, from a review of his medical files, or from some other source). That same day Strasser was sent to the Emergency Department (again, it is unclear from the record at which hospital) for "right lower extremity DVT pain." (*Id.*, ¶ 110.) It is unclear from the defendants' Supplemental Proposed Findings of Fact who made the decision to send him to the Emergency Department.

On August 23, 2022, Strasser saw Wachholz at a follow-up appointment at which "they discussed his medications post-hospitalization". (ECF No. 79, ¶ 111.) While in the hospital, Strasser received Lyrica and Dilaudid. (*Id.*) Wachholz explained that "Lyrica was highly abuseable in the correctional setting and Strasser had a history of gabapentin misuse." (*Id.*) Wachholz suggested trying oxcarbazepine, and Strasser "was agreeable." (*Id.*) Wachholz also ordered another hematology consult. (*Id.*)

Strasser saw Wachholz again on October 6, 2022, asking to resume pain services at GBCI. (ECF No. 79, ¶ 114.) Wachholz referred him for a pain consult. (*Id.*) She also increased his dosage of oxcarbazepine. (*Id.*)

On November 25, 2022, because of Strasser's "perceived increasing pain and his refusal to try Celebrex", Wachholz submitted a request to Dr. LaVoie for gabapentin. (ECF No. 79, ¶ 115.) Dr. LaVoie did not approve the request because "Strasser had no neuropathy etiology [peripheral nerve disease] of functional deficit present." (*Id.*, ¶¶

9

115-116.) On December 23, 2022, Wachholz submitted a request to increase Strasser's amount of acetaminophen, which was approved. (*Id.*, ¶ 118.)

### Dr. LaVoie's Involvement in Strasser's Treatment

Since March 2021 Dr. LaVoie has been the Medical Director for the DOC. (ECF No. 79, ¶ 2.) His role includes determining which drugs are on the formulary list and approving requests for non-formulary medications. (*Id.*, ¶¶ 6, 10) He was never Strasser's Advanced Care Provider and was not responsible for Strasser's treatment plans. (*Id.*, ¶ 33.) At most his involvement was limited to requests for non-formulary medications for Strasser and advising his Advanced Care Providers (including Wachholz), but he does not set treatment plans. (*Id.*)

There is no additional evidence in the record of Dr. LaVoie's involvement in the treatment of Strasser's pain other than the times he reviewed requests for non-formulary medications described above. Regarding his involvement in the treatment of Strasser's DVT, Dr. LaVoie does not dispute that Warfarin is a less expensive option as a blood thinner. (ECF No. 79, ¶¶ 133-135.) The defendants assert that Dr. LaVoie is allowed to consider cost when deciding which medications are formulary or preferred. (*Id.*, ¶ 133.) Dr. LaVoie does not dispute that there are risks associated with prescribing non-steroidal anti-inflammatory drugs (like ibuprofen) with blood thinners, but as explained above the contraindications are relative and not absolute. (*Id.*, ¶ 139.) Medical professionals can weigh the risks of using both on a case-by-case basis. (*Id.*) Regarding the decision to prescribe Warfarin as the "first line of therapy" for battling anticoagulation, Dr. LaVoie states that he wanted to "be responsible with

10

State resources" and "[m]ost patients can be successfully anticoagulated on this medication." (*Id.*, ¶ 136.)

Strasser states that Warfarin should never be prescribed with Celebrex or ibuprofen, though he offers no support for this opinion. (ECF No. 87 at 2; ECF No. 79, ¶ 137.) He also states that, because of his history with stomach ulcers (basically internal bleeding), he was worried that Warfarin could agitate his condition. (ECF No. 79, ¶ 132.) Dr. LaVoie asserts that both Warfarin and Eliquis pose the same risks when it comes to stomach ulcers. (*Id.*, ¶ 132, 144.) Strasser also claims that Warfarin was "clearly not effective", but he does not explain why and what impact its use had on him. (ECF No. 88, ¶ 148.)

<u>Utter's Involvement in Strasser's Treatment</u>

In her role as Health Services Manager, Utter supervised health care services provided to prisoners, including developing procedures, monitoring care plans, and providing administrative support. (ECF No. 79, ¶ 34.) She did not examine, diagnose, or provide prescriptions for prisoners. (*Id.*, ¶ 35.) Utter only reviewed care plans when Advanced Care Providers brought issues to her attention. (*Id.*, ¶ 36.) Utter deferred to the Advanced Care Providers regarding the substance of care plans and recommended medications. (*Id.*, ¶ 39.) At no point did she provide any direct care to Strasser. (*Id.*, ¶ 40.)

Utter's role in Strasser's treatment was limited to responding to Strasser's HSRs when they were forwarded to her by the triaging nurse. (ECF No. 79, ¶ 43.) Even if a prisoner specifically addressed an HSR to Utter, she would only handle it if

11

the triaging nurse felt that she should deal with it. (*Id.*) It is undisputed that Strasser submitted 12 HSRs in the relevant time period to which Utter responded. (*Id.*, ¶¶ 50-79.) As to each HSR Utter addressed the specific concern or issue Strasser raisesd, including informing him of dates of appointments and details of his care plan. (*Id.*) In handling these requests, Utter was not involved in any decisions about providing pain medication or what course of treatment would be appropriate. (*Id.*, ¶ 79.)

Strasser's Allegations

Strasser states that the defendants' approach to pain medication is wrong. (ECF No. 87 at 1.) He asserts that the DOC could easily allow prisoners to take "dangerous" medications such as Lyrica by grinding up the pill and putting it in a water cup, which would prevent abuse. (ECF No. 88, ¶ 16.) He also asserts that the defendants took him off medication that was working (Lyrica) due to a policy of not prescribing opioids that, according to Strasser, made "zero sense". (ECF No. 87 at 2.) They further exposed him to unnecessary risk by allowing him to take medications that had contraindications. (*Id.* at 3.) Strasser states the defendants' actions exposed him to an unnecessary and wanton infliction of pain. (*Id.*)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit."

*See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Strasser claims that Dr. Larson violated his Eighth Amendment rights when he prescribed him ibuprofen for pain medicine instead of something stronger. He also claims that Dr. LaVoie and Utter violated his Eighth Amendment rights when they prescribed him Warfarin, a less expensive blood thinner than Eliquis. He further claims that Dr. LaVoie, Utter, and Wachholz violated his Eighth Amendment rights

13

when they denied him pain medication between October 30, 2021, and November 23, 2022.

A prison official violates the Eighth Amendment where he is deliberately indifferent "to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "To state a cause of action, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Duckworth v. Ahmad,* 532 F.3d 675, 679 (7th Cir. 2008). The parties do not dispute that Strasser's DVT and associated chronic pain is an objectively serious medical condition.

To demonstrate that a state official was deliberately indifferent, a plaintiff must show "that an official *actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis in original). The plaintiff also "must show more than mere evidence of malpractice." *Id.*

*Claim Against Dr. Larson*

Strasser asserts that Dr. Larson treated his medical needs with deliberate indifference when he decided to prescribe him ibuprofen instead of Norco for pain relief even though he knew it had contraindications with Eliquis. To establish that Dr. Larson acted with deliberate indifference, Strasser must show "that the treatment he received was 'blatantly inappropriate.'" *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (quoting *Greeno v. Daley,* 414 F.3d 645, 654 (7th Cir. 2005)). "Making that showing is not easy: 'A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under

14

those circumstances.'" *Id.* (quoting *Sain v. Wood*, 512 F.3d 886, 984-95 (7th Cir. 2008)). As such, "federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represented so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Id.*

No reasonable factfinder could conclude that Dr. Larson's decision to prescribe ibuprofen was a significant departure from professional standards. While Strasser asserts that ibuprofen cannot be taken with Eliquis, he does not offer any support for this assertion other than his own belief. While a non-movant "is entitled . . . to all reasonable inferences in her favor, inferences that are supported by only speculation and conjecture will not defeat a summary judgment motion." *Herzog v. Graphic Packing Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014).

Dr. Larson, on the other hand, asserts that he made his decision based on professional judgment and the knowledge that, while ibuprofen and Eliquis are contraindicatory, the contraindication is relative. In his view, ibuprofen for pain management was an "appropriate option." (ECF No. 52, ¶ 16.) Because Strasser has not demonstrated that this decision was blatantly inappropriate, the court defers to Dr. Larson's treatment decisions. Summary judgment is granted in favor of Dr. Larson.

*Claims Against Utter and Dr. LaVoie for Prescribing Warfarin instead of Eliquis*

Regarding Utter, no reasonable factfinder could conclude that she had any involvement in the decision to prescribe Warfarin instead of Eliquis. Section 1983

15

"creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional violation." *Hildebrant v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003) (quoting *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996)).

Strasser has not presented any evidence demonstrating that Utter had any role in the decision to issue Warfarin rather than Eliquis. "Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020). "It is therefore incumbent on the party opposing a summary judgment motion to 'inform the district court of the reasons why summary judgment should not be entered'" *Reed v. Brex, Inc.*, 8 F. 4th. 569, 578 (7th Cir. 2021) (quoting *Riely v. City of Kokomo*, 909 F.3d 182, 190 (7th Cir. 2018)). Summary judgment on this claim is granted in favor of Utter.

Dr. LaVoie is entitled to the court's deference unless Strasser can demonstrate that his decision to prescribe Warfarin was blatantly inappropriate. Strasser argues that the only reason Dr. LaVoie chose Warfarin is because it is less expensive than Eliquis. Dr. LaVoie does not dispute that Warfarin is less expensive, noting that cost should be taken into consideration when providing healthcare to prisoners using taxpayer money. He also states that, in his professional judgment, Warfarin achieves similar results as Eliquis, and that in Strasser's case the risks were the same as Warfarin.

16

The undisputed facts also show that, when Strasser was put back on Eliquis at the end of January 2022, his blood clots actually worsened. (ECF No. 79, ¶¶ 100-101.) As a result, emergency department doctors recommended that Strasser go back on Warfarin, and Strasser refused. (*Id.*) At most, Strasser demonstrates that he disagreed with Dr. LaVoie's decision to prescribe Warfarin over Eliquis, which is insufficient to prove a constitutional claim. *See Cesal v. Moats*, 851 F.3d 714, 722 (7th Cir. 2017) ("[D]isagreement with a doctor's medical judgment is not enough to support a claim under the Eighth Amendment.") Thus, no reasonable factfinder could conclude that Dr. LaVoie was deliberately indifferent when prescribing Wafrarin. Summary judgment on this claim is granted in his favor.

*Claims Against Utter, Wachholz, and Dr. LaVoie for Denying Pain Medication*

For the same reasons as stated above, Strasser has not demonstrated that Utter had any role in determining what kind of pain medication Strasser would be prescribed. Summary judgment on this claim is granted in Utter's favor.

As for Wachholz, any decision to provide Strasser with the non-formulary medications he requested (Lyrica, gabapentin, etc.) had to be approved by Dr. LaVoie. Anytime Wachholz requested approval for a non-formulary medication it was Dr. LaVoie who declined the request. A plaintiff must "establish not only that a state actor violated his constitutional rights, but also that the violation *caused* the plaintiff injury or damages." *Roe v. Elyea*, 631 F.3d 843, 864 (7th Cir. 2011) (emphasis in the original). In short, because Wachholz was not authorized to provide the non-formulary medications, she could not deny the use of such medications.

17

Also, Strasser does not present any evidence that Wachholz's efforts to treat his pain were blatantly inappropriate. The undisputed facts demonstrate that Wachholz tried several different forms of pain relief, such as biofreeze and a number of different formulary pain medications. Strasser often refused these options, insisting he be provided Lyrica or gabapentin. However, prisoners are not entitled to demand specific medical care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). This is not a case where the plaintiff's pain was not treated; he simply did not receive the treatment he wanted.

No reasonable factfinder could conclude that Wachholz failed to treat Strasser's pain. Summary judgment is granted in Wachholz's favor.

Regarding Dr. LaVoie, Strasser has not demonstrated that his decisions to deny Strasser Lyrica and gabapentin were done as a "gratuitous cruelty." *Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002). Dr. LaVoie considered Strasser's circumstances, including the fact that he had a history of abusing gabapentin, as well as his condition. Dr. LaVoie was exercising his professional judgment when he denied Strasser Lyrica and gabapentin. Prison doctors have an obligation to consider all of the risks when determining which painkillers are appropriate, including the risk of abuse within the prison setting. *See Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). No reasonable factfinder could conclude that Dr. LaVoie failed to exercise his professional judgment when evaluating Strasser's requests for non-formulary medication. Summary judgment is granted in Dr. LaVoie's favor.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted. Although the defendants argued that they were entitled to qualified immunity, because the court found in their favor on the merits, it does not need to address the qualified immunity argument. Because there are no remaining claims, the case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (ECF No. 50) is **GRANTED.**

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion

Case 1:22-cv-01398-WED   Filed 05/27/25   Page 19 of 20   Document 90

under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 27th day of May, 2025.

BY THE COURT

*William E. Duffin*

WILLIAM E. DUFFIN
United States Magistrate Judge